2013 VT 47

## In re William J. McCarty, Jr.

[75 A.3d 589]

No. 12-156

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed June 28, 2013

Motion to Defer Suspension Date Denied July 5, 2013

---

111

*Beth DeBernardi*, Disciplinary Counsel, Burlington, for Petitioner.

*Gary D. McQuesten* of *Valsangiacomo, Detora & McQuesten, PC*, Barre, for Respondent.

¶ 1. **Skoglund, J.** A panel of the Professional Responsibility Board (PRB) concluded that respondent William McCarty violated Vermont Rules of Professional Conduct for his participation in the wrongful eviction of Denise Brennan. The panel recommended that respondent be suspended from the practice of law for six months. Respondent contends that the panel had insufficient evidence to support a finding that he violated the rules; that laches should bar the disciplinary action; and that the resulting sanctions were excessive. We conclude that respondent violated the rules and find the defense of laches inapplicable in this case. However, we find a three-month suspension to be a more appropriate sanction.

¶ 2. Admitted to the Vermont Bar in 1967, respondent established his law practice in Brattleboro. For a number of years, respondent represented Sandra Glick in various legal matters. Sandra Glick owned a home in Brattleboro. In July 2001, she entered into an oral agreement with Denise Brennan to rent Brennan a room in her home with access to most of the property. Brennan moved in days later. Shortly thereafter, on August 8, 2001, Sandra Glick was hospitalized for several weeks as a result of her bipolar disorder. With Sandra Glick hospitalized, Gabrielle Glick, Sandra Glick's adult daughter, became uncomfortable with Brennan living in her mother's home, as she had suspicions that Brennan had impermissibly used Sandra Glick's ATM card.

¶ 3. On August 10, 2001, Gabrielle Glick informed Brennan that she must vacate the premises in thirty days, or by September 9, 2001. Brennan began packing her belongings to comply with Gabrielle's request. Gabrielle then hired respondent to assist with the eviction process, as Gabrielle lived and worked in Massachusetts. On August 13, 2001, respondent sent a letter to Brennan, notifying her that he represented Gabrielle Glick and reiterating that she must leave the premises immediately, no later than September 9. Brennan received the letter on August 16, 2011.

¶ 4. Respondent then composed a second letter to Brennan, which was identical in all respects, except that it did not contain the date by which Brennan was to vacate the property (September 9) and stated that "[t]he desire is that you vacate immediately." Along with the second letter, respondent drafted another document entitled "Notice to Vacate," styled to look like a formalized court order in a suit brought by Sandra Glick, Landlord/Plaintiff against Brennan, Tenant/Defendant. The Notice was signed

by respondent on behalf of Sandra Glick. The text of the Notice provided:

> Pursuant to the provisions of 9 V.S.A. § 4486, you, Denise Brennan are hereby notified to vacate the premises and to restore the premises to its condition at the beginning of the rental term.
>
> . . . .
>
> If you remain in possession after August 17, 2001, Landlord Sandra Glick will be compelled to bring an action for possession as authorized by 9 V.S.A. § 4468, et. al.

¶ 5. On August 17, 2001, Deputy Sheriff Lavalla, a longtime acquaintance of respondent, met Gabrielle Glick at respondent's office and picked up the second letter and the Notice to Vacate with the intention of serving Brennan.[1] Deputy Sheriff Lavalla and Gabrielle Glick went to Sandra Glick's home and served the papers on Brennan and informed her that she was to vacate the premises immediately.[2] Brennan tried to discuss the matter with Deputy Sheriff Lavalla, showing him previous documents which stated that she was not required to vacate the premises until September 9, 2001. Deputy Sheriff Lavalla refused to look at the papers and insisted that she leave immediately. He threatened to handcuff and arrest her if she did not leave.

¶ 6. Chaos ensued. Unable to reach respondent to make sense of the matter, Brennan became hysterical. She had nowhere to go and no one to care for her dog. After locking her belongings in a room in the house, Deputy Sheriff Lavalla took Brennan to the Brattleboro Hospital Emergency Room, at her request. Animal control took the dog. As a result of the sudden eviction, Brennan suffered serious emotional and physical consequences, including

---

[1] Though respondent testified that he did not call the Deputy Sheriff's office, the panel concluded that respondent called and instructed the Deputy Sheriff to serve the papers on Brennan. Respondent's billing records reflect that he signed off on "calls to Deputy Lavalla" on August 13 and "calls to and from Sheriff regarding service and schedule" on August 15, 2001. Respondent testified that these were likely "duplicate entries" and one of his staff members made the calls.

[2] Deputy Sheriff Lavalla does not recall being personally informed by respondent that he was to remove Brennan. Rather, he testified that the office manager handled the matter. He further testified that he understood the papers to mean that Brennan was to vacate the premises that day — though he never read the whole document, stopping after seeing that Brennan was to vacate "forthwith."

post traumatic stress disorder and intermittent homelessness. The circumstances also exacerbated her substance abuse issues.

¶ 7. Oral rental agreements, such as between Brennan and Sandra Glick, are legally enforceable. See 9 V.S.A. § 4451(8). The landlord must provide adequate notice to terminate a tenancy. See generally 9 V.S.A. § 4467(h) ("A rental arrangement whereby a person rents to another individual one or more rooms in his or her personal residence that includes the shared use of any of the common living spaces . . . may be terminated by either party by providing actual notice to the other of the date the rental agreement shall terminate, which shall be at least 15 days after the date of actual notice if the rent is payable monthly . . . ."). It is only when the tenant does not vacate by the specified date that the landlord may commence a civil action in the superior court. The landlord must prove entitlement to possession and obtain a judgment from the court awarding possession to the landlord. 12 V.S.A. § 4761. The judgment must be served on the tenant, and if the tenant does not leave, the landlord may then apply to the superior court for a writ of possession. Id. § 4854. Once the writ is served on the tenant, the tenant then has five business days to vacate the premises. Only if the tenant does not vacate within that time may a sheriff forcibly remove the tenant. Id.

¶ 8. Respondent had done landlord-tenant work for previous clients. Respondent knew that Brennan was legally entitled to stay on the premises until September 9. Nonetheless, "he was anxious to have Ms. Brennan leave the property as soon as possible in order to protect . . . and safeguard" his client's property. Based on his testimony and the testimony of others, the hearing panel concluded that respondent intentionally removed the date of termination from the second letter to deceive Brennan and effectuate an immediate eviction.

¶ 9. The panel also found that respondent instructed Deputy Sheriff Lavalla to remove Brennan on August 17, 2001, even though Lavalla did not recall being informed by respondent himself. Lavalla testified that the office manager handled the matter. Nevertheless, he understood from the papers that Brennan was to vacate the premises that day.

¶ 10. Respondent did not express any surprise that Brennan left on August 17, but instead testified that he was "relieved" she vacated the premises. Thereafter, respondent made no attempt to inform Glick, Brennan, or Deputy Sheriff Lavalla that Brennan

was not legally required to leave the premises. Nor did he make any further inquiry regarding Brennan's remaining property in Glick's home.

¶ 11. Accordingly, the panel found that respondent violated Rules 1.2(d), 4.1, 4.4, 8.4(c), 8.4(d), and 8.4(h) of the Vermont Rules of Professional Conduct. All told, his acts of deception in drafting misleading correspondence and making false statements violated rules prohibiting a lawyer from engaging in fraudulent behavior, making false statements, and violating others' rights. As a result of respondent's violations concerning this incident, past infractions, public concern, and respondent's personal circumstances, the panel recommended that respondent be suspended from the practice of law for six months. On appeal, respondent argues that the panel failed to use the proper standard of proof; that there is insufficient evidence to support its factual findings; that laches should bar the disciplinary action; and that the resulting sanction is excessive. Respondent, however, does not dispute that the facts, if found to be true, would support the underlying violations.

¶ 12. Respondent first argues that the panel was required to employ a higher standard of proof to prove his alleged fraudulent activity. He contends that the hearing panel did not acknowledge the higher standard of proof associated with fraud and that disciplinary counsel did not meet its burden in showing that he committed fraud. However, respondent is not charged with common-law fraud. See *Estate of Alden v. Dee*, 2011 VT 64, ¶ 32, 190 Vt. 401, 35 A.3d 950 (proving common-law fraud must be done by clear and convincing evidence). Rather, he is alleged to have conducted dishonest, fraudulent, or deceitful activity in violation of Professional Conduct Rule 8.4(c). All formal charges of misconduct "shall be established by clear and convincing evidence." A.O. 9, Rule 16(C). Without evidence to the contrary, we presume the panel employed the appropriate standard of review.

¶ 13. Respondent next asserts that the evidence does not support the panel's findings of fact. Specifically, respondent alleges that the panel improperly concluded that he colluded with Deputy Sheriff Lavalla to evict Brennan on the basis that they had known one another for thirty years, they both belong to the Vermont Chapter of the Marine Corps League, and their wives worked together for the hospital auxiliary.

116

■ ¶ 14. Findings of fact shall not be set aside unless clearly erroneous. On review, we will uphold the panel's findings unless they are clearly in error. A.O. 9, Rule 11(E); *In re Pressly*, 160 Vt. 319, 322, 628 A.2d 927, 929 (1993). Based on respondent's testimony, the panel found that respondent "desired to have Ms. Brennan leave immediately" and was "relieved" when she was removed. The panel concluded that respondent drafted the second eviction letter and the Notice to Vacate to compel Brennan to vacate the premises. Further reinforcing its finding, the panel looked to the credible testimony of others. Gabrielle Glick testified that she took time off work and came to Vermont because she believed Brennan would be removed from the property on August 17, 2001. Deputy Sheriff Lavalla also understood that it was his job to ensure that Brennan vacated the property that day. "Against the backdrop of the clear understanding of all of the other parties," the panel concluded that respondent's "testimony that he did not intend the second letter and Notice to Vacate to communicate that Ms. Brennan was required to leave forthwith, or that she and Deputy Sheriff Lavalla had only to read it carefully to understand that" was not credible. Put another way, the panel found that respondent drafted documents in a manner intending to fraudulently deceive and conspired with Deputy Sheriff Lavalla to accomplish an eviction even though no writ of possession had ever been issued by the court. The panel did not base its conclusion solely, or even primarily, on the fact that Deputy Sheriff Lavalla and respondent had a prior relationship. Rather, the panel reached its conclusion based on the credibility of the witnesses and totality of the facts. Because the panel's decision is "clearly and reasonably supported by the evidence," we find no reason to disturb its findings. See *In re Berk*, 157 Vt. 524, 527, 602 A.2d 946, 947 (1991) (quotations omitted).

■ ¶ 15. Respondent next contends that the charges should be dismissed on the grounds of laches. Laches is an equitable defense that bars relief when a party fails "to assert a right for an unreasonable and unexplained lapse of time." *Comings & Livingston v. Powell*, 97 Vt. 286, 293, 122 A. 591, 594 (1923). A lapse of time is not enough. "Laches involves prejudice, actual or implied, resulting from the delay. It does not arise from delay alone, but from delay that works disadvantage to another." *Id.* at 294, 122 A. at 594.

¶ 16. The underlying wrongful eviction that prompted disciplinary action took place in August 2001. Respondent was first notified that there was an investigation regarding his conduct in the eviction matter in October 2004. In August 2005, disciplinary counsel informed respondent that a hearing panel found probable cause to charge him with six violations of the rules. Nonetheless, formal charges were not brought against respondent until July 2010. Respondent argues that this significant time delay prejudiced his case. Specifically, he claims that the four witnesses involved in the eviction, namely Deputy Sheriff Lavalla, Sandra Glick, Gabrielle Glick, and his assistant were "unavailable" during the 2011 hearing.

¶ 17. There is no statutory or rule-based limitation in attorney disciplinary proceedings, and delay, alone, does not warrant dismissal. See *In re Wright*, 131 Vt. 473, 489, 310 A.2d 1, 9 (1973) (finding that no statute of limitations applies to attorney disciplinary proceedings); see also A.O. 9, Rule16(I). The purpose of attorney discipline proceedings is to protect the public by assessing the attorney's fitness to practice law. See ABA Ctr. for Prof'l Responsibility, *Standards for Imposing Lawyer Sanctions*, § 1.1 (1986) (amended 1992) [hereinafter ABA Standards]. Absent a showing of prejudice, a mere delay in bringing a disciplinary action does not justify dismissal.[3]

¶ 18. Respondent has not adequately established prejudice here. Respondent asserts that several witnesses have become "unavailable" or have dulled memories as a result of the time

---

[3] A few jurisdictions do not permit the defense of laches to bar an attorney disciplinary proceeding. These courts either use the delay as a factor to be considered in the disciplinary sanction determination, see, e.g., *In re Eisenberg*, 423 N.W.2d 867, 872 (Wis. 1988), or do not permit delay to serve as a mitigating factor, especially where the public interest is served, see, e.g., *Attorney Grievance Comm'n of Md. v. Snyder*, 793 A.2d 515, 533-34 (Md. 2002). As far as we can determine, only one court has permitted the equitable defense of laches to bar an attorney disciplinary action, *Tenn. Bar Ass'n v. Berke*, 344 S.W.2d 567, 571-72 (Tenn. Ct. App. 1960), where the vast majority of courts leave the ultimate question of whether laches is available in legal malpractice unaddressed. See *In re Tenenbaum*, 918 A.2d 1109, 1113-14 (Del. 2007); *In re Johnson*, 2004 MT 6, ¶¶ 20-21, 84 P.3d 637; *In re Siegal*, 708 N.E.2d 869, 871-72 (Ind. 1999); *Ching v. State Bar of Nevada*, 895 P.2d 646, 648-49 (Nev. 1995); *In re Wade*, 814 P.2d 753, 764 (Ariz. 1991); *Harris v. State Bar of Cal.*, 800 P.2d 906, 910 (Cal. 1990). Courts have found similarly in other professional disciplinary proceedings, such as physician disciplinary actions.

lapse. Though many courts recognize that evidentiary prejudice can result from witnesses whose memories have faded, or who have died, we cannot substantiate respondent's laches defense on the facts presented. See *In re Siegal*, 708 N.E.2d 869 (Ind. 1999).

¶ 19. Respondent's first claim of prejudice is that Deputy Sheriff Lavalla was unavailable to testify in front of the 2011 hearing board panel. It is uncontested that Deputy Sheriff Lavalla suffered a transient ischemic attack (TIA) in 2006, which reduced his ability to recall the events of 2001 with clarity. The hearing panel found that respondent failed to show resulting prejudice from this because Lavalla testified before the TIA in the 2004 civil proceeding brought by Brennan concerning the wrongful eviction,[4] and further found that a transcript of his prior testimony would be "available to refresh Lavalla's recollection with respect to any forgotten evidence favorable to [r]espondent." Respondent contends that Lavalla's previous testimony was not adequate because respondent was not a party in the prior litigation nor were there charges of unprofessional conduct in the 2004 proceedings.

¶ 20. Vermont Rule of Evidence 612 entitles a witness to use a writing or object to refresh memory. As found by the hearing panel, respondent could have used Lavalla's testimony from the 2004 civil suit to refresh Lavalla's recollection with respect to any forgotten facts, but he did not. While it is true that respondent was dismissed from the prior civil suit and his professionalism was not under review in that instance, Lavalla still testified to the underlying facts surrounding the eviction. Because Lavalla's recollection may have been sufficiently refreshed by his previous testimony, we agree with the panel that without attempting to refresh Lavalla's memory, respondent cannot declare Lavalla unavailable for the purposes of the hearing.

¶ 21. Next, respondent asserts that he was prejudiced by the death of Sandra Glick. This argument is unavailing. Though Sandra Glick was the landlord in this case, she was hospitalized and incapacitated during the eviction. She did not witness the events that gave rise to the disciplinary proceedings; nor is there

---

[4] In 2004 Brennan brought a wrongful eviction action against Sandra Glick, Deputy Sheriff Lavalla, and respondent. Respondent was dismissed as a party because the court concluded that the "Vermont Residential Rental Agreements Act (VRRAA) provides for a cause of action against landlords who illegally evict tenants, but not against the landlords' attorneys." The jury awarded Brennan damages roughly in the amount of $290,000 in addition to attorney's fees and costs.

evidence to suggest that Sandra Glick would provide exculpatory testimony for respondent in this matter. As such, we do not find that respondent was prejudiced by the death of Sandra Glick.

¶ 22. Third, respondent argues that Gabrielle Glick, a resident of Massachusetts, was unavailable because she was outside the court's subpoena power. However, the parties stipulated that Gabrielle's deposition could be substituted for her live testimony, and in effect, respondent waived any objection to her absence. In any event, Gabrielle Glick has always been a resident of Massachusetts with respect to this proceeding. Because her availability has not changed as a result of the delay, we find no prejudice.

¶ 23. Finally, respondent argues that he is prejudiced by the unavailability of his office assistant. According to respondent, his assistant left without notice some time ago and cannot be located. It is unclear, however, what respondent's assistant would have added to the discussion, and respondent fails to provide further support other than allegations that she was the individual "who would have drafted the documents involved in this matter." Regardless of who drafted the documents, respondent signed the papers, and he makes no allegation that his assistant would have drafted these documents contrary to his direction. Because respondent does not specify how he is harmed by his assistant's absence, we fail to see the resulting prejudice. In sum, respondent fails to demonstrate how the delay prejudices the proceedings and, therefore, the defense of laches does not apply.

¶ 24. As a final matter, respondent asserts that the sanction imposed by the hearing panel is excessive. The panel recommended a six-month suspension from the practice of law. Disciplinary counsel maintains that respondent should be disbarred on the basis of prior discipline,[5] dishonest motive, refusal to acknowledge the wrongful nature of his conduct, the vulnerability of the victim, his substantial experience, and his indifference in providing restitution for his actions. Respondent argues that at most he should receive a public reprimand for the violations.

---

[5] Respondent has five prior disciplinary actions. In June 1987, respondent was admonished for failure to cooperate with Bar Counsel. He received a public reprimand for neglect of several client matters. In 1995, respondent received admonishment from the Professional Conduct Board for refusing to turn over a client's file to new counsel. He was disciplined again in 1995 for his failure to return client property upon the conclusion of representation and his refusal to admit the wrongful nature of his conduct. Finally, in 1999, respondent was disciplined for lying to the court.

■ ¶ 25. Imposition of a sanction is a matter left to this Court's discretion. "This Court makes its own determination as to which sanctions are appropriate, but we nevertheless give deference to the recommendation of the Hearing Panel." *In re Blais*, 174 Vt. 628, 630, 817 A.2d 1266, 1269 (2002) (mem.).

■ ¶ 26. "The American Bar Association's Standards for Imposing Lawyer Sanctions guide our" disciplinary sanctions. See *In re Fink*, 2011 VT 42, ¶ 35, 189 Vt. 470, 22 A.3d 461. "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged . . . their professional duties to clients, the public, the legal system, and the legal profession." ABA Standards § 1.1; see also *In re Hunter*, 167 Vt. 219, 226, 704 A.2d 1154, 1158 (1997) (The purpose of sanctions is not "to punish attorneys, but rather to protect the public from harm and to maintain confidence in our legal institutions by deterring future misconduct.").

■ ¶ 27. Under this framework, we consider the duty violated, the lawyer's mental state, the actual or potential injury, and any aggravating or mitigating circumstances. ABA Standards § 3.0. Depending on the importance of the duty violated, the level of the attorney's culpability, and the extent of the harm caused, the standards provide a presumptive sanction, which can then be adjusted based on aggravating or mitigating factors. See V.R.Pr.C. Scope.

■ ■ ¶ 28. Here, respondent owed a duty to his client, the public, and his profession. Like all attorneys, he had a duty to avoid conduct "involving dishonesty, fraud, deceit or misrepresentation," V.R.Pr.C. 8.4(c), as well as to maintain the standards of personal integrity. ABA Standards § 5.0. As an officer of the court, respondent had an obligation to abide by the legal rules of both substance and procedure that affect the administration of justice. ABA Standards § 6.0. Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system. Having a duty to uphold and obey the law, as both a citizen and professional, respondent, here, intentionally violated the legal process by circumventing the statutorily prescribed eviction process.

¶ 29. Respondent purposefully drafted a Notice to Vacate, stylized as a legitimate court document. The Notice was designed to create the impression that Brennan was required to leave the premises immediately, even though by law and agreement, she did not have to leave until later the next month.

¶ 30. These actions gave rise to serious consequences — Brennan lost her home without warning, causing her to enter a period of homelessness and exacerbating serious physical and mental conditions. Respondent's actions also had grave consequences for Sandra Glick who became embroiled in the wrongful eviction lawsuit, ending with a judgment of approximately $290,000 against her. The legal system was also injured, for any time an attorney purposefully ignores legal procedures for his client's benefit, the legal system is undermined and thereby harmed.

¶ 31. Under the ABA Standards, an intentional violation of a duty, giving rise to actual injury, calls for a presumptive sanction of disbarment. ABA Standards § 7.1. In the present case, however, the panel found, and we agree, that the circumstances, taken together, support suspension rather than disbarment, which is generally "reserved for cases in which the attorney was convicted of a felony and often where there has been loss or the potential for loss of client funds." The panel specifically looked to *In re Rice*, PRB Decision No. 64 (Sept. 13, 2004), where Attorney Rice avoided the legal process to assist his client in hiding assets from creditors. Based on the ABA Standards, a panel of the PRB suspended Rice for thirty days due to the presence of aggravating factors similar to the case at hand. Like respondent, Rice was an experienced attorney, had received prior discipline, and failed to acknowledge the wrongful nature of his conduct. Here, the panel concluded that respondent's conduct was more severe than Rice's in that he intentionally drafted deceptive documents to circumvent the legal process, which produced serious injury for Brennan, Sandra Glick, and the legal system, all of which are aggravating factors that call for a longer suspension.

¶ 32. Specifically, the panel considered the following additional aggravating factors: respondent's substantial experience as a lawyer; his prior discipline; his failure to acknowledge the wrongful nature of his conduct; and the vulnerability of the parties involved, namely Brennan and Sandra Glick. The panel also gave considerable attention to respondent's five prior disciplinary actions and his failure to acknowledge responsibility or wrongdoing.

¶ 33. The panel considered mitigating factors as well. While the panel did not find respondent's previous chemical dependency to be a mitigating factor, as he had been sober for more than a year after a successful rehabilitation at the time of the incident, it took notice of respondent's recovery and found this mitigated his prior disciplinary offenses that occurred before his rehabilitation. The panel also highlighted the fact that there have been no known subsequent violations since the wrongful eviction. Accordingly, the panel afforded "some weight in mitigation to the delay, coupled with the testimony that Respondent has changed and his formerly aggressive behavior has ceased."

¶ 34. On balance, we agree with the panel that a suspension is the most appropriate sanction. We find that respondent's actions were severe. Respondent's manipulation of the legal system created dire consequences for both his client and Brennan, and he altogether disregarded his duties to uphold the law and maintain professional integrity. Further augmenting the violations arising out of this case are the five previous disciplinary actions, making respondent's continued refusal to acknowledge wrongdoing particularly egregious. Nonetheless, there are mitigating factors. This matter has been delayed for a long period of time and, in the interim, respondent has not had other violations brought against him. Because the sanctions are not designed to be punitive in nature but rather are imposed to protect the public and the profession, we give strong consideration to the fact that respondent has not violated the rules in the last eleven years and find that a three-month suspension is appropriate. See *In re Keitel*, 172 Vt. 537, 538, 772 A.2d 507, 510 (2001) (mem.) ("The purpose of sanctions is not punishment. Rather, they are intended to protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar.") (quotation and alteration omitted).

*William McCarty, Jr. is suspended from the practice of law for three months from the date of this order for violating Rules 1.2(d), 4.1, 4.4, 8.4(c), 8.4(d), and 8.4(h) of the Vermont Rules of Professional Conduct by intentionally drafting legal documents designed to mislead and circumvent the legal process.*